IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Bear Staffing,                              :
                    Petitioner              :
                                            :    No. 949 C.D. 2020
            v.                              :
                                            :    Argued: September 20, 2021
Shawn Logan (Workers'                       :
Compensation Appeal Board),                 :
                    Respondent              :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ELLEN CEISLER, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                              FILED:  October 15, 2021


            In this case, we consider the impact of an employer's decision to terminate an employee, for asserted noncompliance with the employer's drug-testing policy, upon the employee's entitlement to benefits under the Workers' Compensation Act (Act).[1]  Bear Staffing (Employer) petitions for review of the September 2, 2020 order of the Workers' Compensation Appeal Board (Board), which affirmed, with modification, the May 22, 2019 decision of Workers' Compensation Judge Joseph Stokes (WCJ) to grant Shawn Logan's (Claimant) claim petition and to deny Employer's termination petition.  We affirm the decision of the Board.

            Claimant worked for Employer, a temporary employment agency, which assigned him to work at Barry Callebaut Chocolates.  (WCJ's Finding of Fact (F.F.)

_____

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

¶1; Certified Record (C.R.) Item 9.) His duties involved carrying 50-pound bags of cocoa and blocks of butter, which he loaded into machines. On April 18, 2018, while in the performance of his duties, Claimant slipped and fell on the floor, striking his head and back on the ground. Claimant explained that the room temperature was nearly 100 degrees Fahrenheit, and the floor was greasy from melted butter. Claimant lost consciousness after hitting his head, and he was taken by ambulance to Crozer Chester Medical Center.

Claimant sustained injuries to his head, neck, and lower back, and the fall aggravated preexisting injuries. On April 26, 2018, Claimant filed a claim petition in connection with the incident, to which Employer filed a timely answer, denying the allegations. On May 10, 2018, Employer issued an amended medical-only notice of temporary compensation payable (NTCP), acknowledging Claimant's work-related injury. On July 18, 2018, the NTCP converted to a notice of compensation payable by operation of law. *See* section 406.1(d)(6) of the Act, added by the Act of February 8, 1972, P.L. 25, 77 P.S. §717.1(d)(6); Exhibit C-03, C.R. Item 19. Thereafter, on July 24, 2018, Employer filed a termination petition, alleging that Claimant had fully recovered from his injuries as of June 15, 2018.

In support of his claim petition, Claimant presented the testimony of Dr. Len Finkel, a chiropractor, and Dr. William Murphy, D.O., both of whom treated Claimant in connection with his injuries. Dr. Finkel's diagnosis at Claimant's first visit included post-concussive syndrome, cervical sprain/strain, thoracic sprain/strain, and lumbar sprain/strain, with evidence of lumbar radiculopathy. (F.F. ¶3.) Dr. Finkel opined that those injuries rendered Claimant unable to perform the duties of his job. Dr. Finkel, however, eventually released Claimant to try restricted duty work. Dr. Murphy explained that he had been treating Claimant for an earlier work injury that

2

occurred in 2015, and although Claimant was able to perform his work duties despite the earlier injury, the April 18, 2018 incident rendered him totally disabled. (F.F. ¶4.) Dr. Murphy diagnosed Claimant with a scalp contusion, concussion from post-concussive syndrome, post-traumatic cephalgia, cervical strain/sprain, lumbrosacral strain/sprain, and a contusion. *Id.* The WCJ ultimately found the testimony of both Dr. Finkel and Dr. Murphy to be "credible and convincing," and expressly found incredible the testimony of Employer's expert, Dr. Neil Kahanovitz, M.D., who opined that Claimant had fully recovered from his injuries as of June 15, 2018. (F.F. ¶¶7, 10-12.)

On April 19, 2018, the day after Claimant's injury, Employer directed Claimant to WorkNet for a drug test in accordance with its company policies. Ms. Kristen Shegda, a WorkNet employee, testified that she took Claimant through drug and alcohol testing. (F.F. ¶5.) The testing included a breathalyzer to test for the presence of alcohol, which returned no indications. For the drug screening, Claimant was required to provide a urine sample. Ms. Shegda explained that Claimant's urine exceeded the 100-degree temperature threshold for an acceptable sample, which required him to provide a second sample under observation. Claimant explained that he would be unable to provide another sample right away, so he was given some water and taken to an examination room to wait. Ms. Shegda arranged for Dr. Dominic Oteri, M.D., a male physician working at WorkNet, to observe Claimant when he provided the second sample. Once Claimant indicated that he was ready, he and Dr. Oteri went into the bathroom while Ms. Shegda waited outside. Shortly thereafter, Ms. Shegda observed them come back out of the bathroom. Claimant appeared angry and declared that the observation was an invasion of his privacy. Claimant did not provide a second urine sample. Because the original sample was outside the required temperature range

3

and a second sample was not obtained, Ms. Shegda explained, no drug testing was completed.

Dr. Oteri also testified about the drug-testing procedure. (F.F. ¶6.) He explained that he previously has encountered people who have difficulty providing a second sample because they had recently urinated and assert that they cannot do so while someone is watching them. In this instance, Dr. Oteri explained, he went into the bathroom with Claimant, and Claimant stated that he was uncomfortable being observed. Dr. Oteri testified that Claimant appeared angry and objected to an invasion of his privacy. Dr. Oteri cautioned Claimant that this was something that could cause him to lose his job, but Claimant left without providing a second urine sample.

Mr. Gary Johnson, Employer's Executive Vice President and Chief Operating Officer, testified about Employer's drug-testing policy and the steps that it took after Claimant's testing. (F.F. ¶8.) Mr. Johnson explained that Employer has specific policies concerning drug and alcohol testing following work-related injuries, that these policies are covered in the hiring process, and that Claimant signed an acknowledgment of the policies when he was hired. After Mr. Johnson became aware that Claimant had been released for restricted duty work, he sent a letter to Claimant, dated July 9, 2018, indicating that Employer was unable to offer Claimant future work due to his failure to comply with the policy governing post-injury drug-testing. Mr. Johnson testified that the termination of Claimant's employment was due solely to the violation of the policy, and, had Claimant not violated the policy, Employer would have found work for Claimant within his restrictions, without a loss in earnings.

After reviewing the evidence and the testimony, the WCJ found Claimant credible with regard to his description of his injury and the symptoms that he experienced. (F.F. ¶9.) As noted, the WCJ further credited Claimant's medical

4

experts' testimony, to the exclusion of the expert testimony offered by Employer. (F.F. ¶¶10-12.) Importantly, the WCJ expressly found that "Claimant is also credible and convincing that he was not purposefully refusing to provide a urine sample as required by . . . Employer's work policy." (F.F. ¶9.) The WCJ credited both Ms. Shegda's and Dr. Oteri's descriptions of the occurrences when they attempted to obtain a second urine sample from Claimant; however, the WCJ again made clear that he credited Claimant's testimony "as to his inability to provide the second urine sample and not his refusal to provide that sample." (F.F. ¶13.) The WCJ credited Mr. Johnson's explanation of Employer's drug-testing policy and Employer's determination that Claimant had violated the policy. (F.F. ¶14.) However, once again, the WCJ stressed that he credited Claimant's testimony regarding his "inability" to provide a second urine sample, rather than his intentional "refusal" to provide the sample. *Id.*

In his conclusions of law, the WCJ determined that Claimant met his burden of proof to establish that he sustained work-related injuries that rendered him unable to perform the duties of his job. (WCJ's Conclusions of Law (C.L.) ¶¶2-3.) Employer, the WCJ concluded, failed to meet its burden to demonstrate that Claimant had fully recovered from his injuries as of June 15, 2018; however, the WCJ concluded that Dr. Kahanovitz's opinion to that effect provided Employer with a reasonable basis for contest. (C.L. ¶¶4-5.) Accordingly, the WCJ concluded that Employer was responsible for the payment of workers' compensation benefits to Claimant, as well as Claimant's litigation expenses and all medical expenses that were reasonable, necessary, and related to Claimant's work-related injury. (C.L. ¶¶6, 8.) Employer was entitled, however, to modify Claimant's benefits in connection with future wages that Claimant earns. (C.L. ¶7.) Employer appealed the WCJ's decision to the Board.

5

On review of the WCJ's decision, the Board affirmed in large part, modifying the WCJ's decision only inasmuch as the WCJ had incorrectly listed the date of Claimant's injury as April 18, *2017*, rather than the correct date of April 18, 2018. (Board's Opinion at 2-3; C.R. Item 12.) The Board first rejected Employer's contention that the WCJ failed to issue a reasoned decision because he purportedly did not identify objective factors supporting his credibility determinations pertaining to the parties' expert witnesses. The Board reviewed the expert testimony and the WCJ's findings, and concluded that the WCJ had adequately explained that his credibility determinations were supported by Claimant's testimony, Claimant's expert's clinical observations of Claimant, medical records, and diagnostic tests. (Board Opinion at 4-8.) Because credibility determinations were the prerogative of the WCJ, and because the WCJ's stated reasons provided an adequate basis for appellate review, the Board found that the WCJ issued a suitably reasoned decision.

Turning to the challenge presently at issue, the Board considered Employer's assertion that Claimant was discharged for cause due to his failure to comply with Employer's drug-testing policy, and that Claimant's loss of earnings was attributable to that discharge. Under section 413(a) of the Act, 77 P.S. §772(a), the Board noted, a suspension of benefits is proper where a loss of earnings is not caused by the work injury. The Board acknowledged that, once a loss of earning capacity has been demonstrated, the claimant generally should be entitled to disability benefits; however, such benefits are not warranted where the employer can demonstrate that employment is available within the claimant's restrictions or would have been available but for the claimant's lack of good faith resulting in a discharge from employment. (Board's Opinion at 9 (citing *Stevens v. Workers' Compensation Appeal Board (Consolidation Coal Co.)*, 760 A.2d 369, 376-77 (Pa. 2000)).) Further citing our

6

Supreme Court's decision in *Vista International Hotel v. Workers' Compensation Appeal Board (Daniels)*, 742 A.2d 649, 657 (Pa. 1999), the Board noted that a post-injury involuntary discharge is to be considered in connection with the separate determination of job availability, and a WCJ may consider fault-based considerations in connection with the firing, *e.g.*, the claimant's good or bad faith, to determine whether the employer has met its burden of establishing alternative job availability. This is not the same as the strict willful misconduct standard used in unemployment compensation proceedings, the Board noted, but "some 'bad faith' willful misconduct on the part of the claimant that caused the discharge has to be established." (Board's Opinion at 10 (quoting *Virgo v. Workers' Compensation Appeal Board (County of Lehigh-Cedarbrook)*, 890 A.2d 13, 19 (Pa. Cmwlth. 2005)).)

The Board concluded that Employer failed to make the necessary showing. The Board reviewed the testimony of Claimant, Ms. Shegda, Dr. Oteri, and Mr. Johnson, and stressed that the WCJ credited Claimant's explanation that he was unable to provide a second urine sample under observation, rejecting Employer's suggestion that Claimant had simply refused to provide the sample. The Board emphasized that the WCJ alone is empowered to find facts, and the Board is not authorized to re-weigh the evidence or to disturb the WCJ's credibility determinations. (Board's Opinion at 13, 14 (citing *Lehigh County Vo-Tech School v. Workmen's Compensation Appeal Board (Wolfe)*, 652 A.2d 797, 800-01 (Pa. 1995); *Sherrod v. Workmen's Compensation Appeal Board (Thoroughgood, Inc.)*, 666 A.2d 383, 385 (Pa. Cmwlth. 1995)).) Because the WCJ conclusively determined that Claimant's discharge from employment resulted from his inability rather than his bad faith refusal to comply with Employer's drug-testing policy, the Board concluded that Employer

7

failed to establish the requisite "bad faith willful misconduct" necessary to support the suspension of Claimant's disability benefits. (Board's Opinion at 15.)

Board Chairman Alfonso Frioni, Jr., authored a dissent from the Board's order. Chairman Frioni noted that Claimant's initial urine sample was abnormal, and that Claimant chose not to provide a second sample either then or at another time. In Chairman Frioni's view, Claimant was discharged "because he violated policy, not because he was unable to provide a specimen in front of a physician." (Board Opinion at 15.)

Employer appealed to this Court.[2] Employer presents one issue for our consideration: whether the WCJ erred in awarding Claimant ongoing disability benefits where he was terminated for failing to comply with Employer's drug-testing policy, and such termination, rather than Claimant's injury, was the cause of his subsequent wage loss.

Employer acknowledges the WCJ's credibility determination regarding Claimant's inability to provide a second urine sample for drug testing, but Employer suggests that this credibility finding "should not have been the end of the analysis." (Employer's Br. at 17.) To that end, Employer stresses that the WCJ also credited Ms. Shegda's and Dr. Oteri's descriptions of the occurrences surrounding Claimant's failure to provide a second sample, including Claimant's angry behavior and use of profanity. *Id.* at 18. This, in Employer's view, demonstrates that Claimant refused to cooperate with the testing procedure, and thus evidenced a lack of good faith. *Id.* As Mr. Johnson explained, Employer then terminated Claimant and determined that it was

---

[2] Under our standard of review, we determine whether constitutional rights were violated, whether errors of law were committed, or whether necessary findings of fact were supported by substantial competent evidence. *Stepp v. Workers' Compensation Appeal Board (FairPoint Communications, Inc.)*, 99 A.3d 598, 601 n.6 (Pa. Cmwlth. 2014).

8

unable to offer him future work due to his failure to comply with the drug-testing policy—a failure that, according to Employer, is the sole reason for Claimant's loss of earnings. *Id.* at 18-19.

In this regard, Employer compares the instant case to *Edwards v. Workers' Compensation Appeal Board (Sear's Logistic Services)*, 770 A.2d 805 (Pa. Cmwlth. 2001). In *Edwards*, an employee who sustained a work-related back injury took a post-injury drug test, in accordance with the employer's policy, which indicated his use of an illegal drug. *Id.* at 806. The employer then terminated the employee due to the drug test results. Affirming the decision of the WCJ and the Board to suspend the employee's benefits following the termination, this Court noted that, because the employee "was discharged for violating [the employer's] policy prohibiting a use of illegal drugs, his loss of earnings subsequent to the discharge was caused by his own action, not by the work injury." *Id.* at 808. Employer argues that the same reasoning applies in the instant case, as Claimant's loss of earnings was caused by his own failure to comply with Employer's drug-testing policy. (Employer's Br. at 14-15.)

Claimant, for his part, contends that Employer's argument amounts to a suggestion that this Court exceed its appellate role and disturb the WCJ's credibility determinations. Claimant argues that, at bottom, "this is nothing more than a credibility dispute." (Claimant's Br. at 7.) Because the WCJ credited Claimant's explanation that he was unable to provide a second urine sample while being observed, and that he did not intentionally refuse to comply with Employer's drug-testing policy, Claimant asserts that the WCJ's finding is dispositive of whether his discharge, and thus his loss in earnings, was attributable to bad faith misconduct on his part. Moreover, Claimant contends that Employer was required to prove an additional element of available work within his restrictions, and because Mr. Johnson did not identify a *specific* job available

9

to Claimant, but rather indicated that Employer would have found some job for Claimant, Employer failed to satisfy this criterion. *Id.* at 14.[3]

Under the Act, a claimant bears the initial burden to establish the elements necessary to support an award of compensation, *i.e.*, that he sustained a work-related injury and that the injury resulted in his disability. *Reyes v. Workers' Compensation Appeal Board (AMTEC)*, 967 A.2d 1071, 1077 (Pa. Cmwlth. 2009) (*en banc*) (citing *Inglis House v. Workmen's Compensation Appeal Board (Reedy)*, 634 A.2d 592, 595 (Pa. 1993); *Fotta v. Workmen's Compensation Appeal Board (U.S. Steel/USX Corp. Maple Creek Mine)*, 626 A.2d 1144, 1146 (Pa. 1993)). "Disability" is a term of art in the workers' compensation context, generally "synonymous with loss of earning power resulting from a work-related injury." *Whitfield v. Workers' Compensation Appeal Board (Tenet Health System Hahnemann LLC)*, 188 A.3d 599, 612 (Pa. Cmwlth. 2018) (*en banc*) (citing *Westmoreland Regional Hospital v. Workers' Compensation Appeal Board (Stopa)*, 789 A.2d 413, 416 (Pa. Cmwlth. 2001)).[4]

Presently, Employer does not deny that Claimant sustained a work-related injury, and it does not challenge the extent of that injury or the details of Claimant's diagnoses. Employer instead contends that Claimant's injury was not the cause of his loss in earning power; rather, Claimant's lost earnings were a result of his discharge

---

[3] Separately, Claimant argues that Employer waived all affirmative defenses, including Claimant's asserted termination for cause, by failing to specifically plead the defense in its answer to the claim petition. Claimant additionally contends that, because Employer is effectively challenging a credibility determination, Employer's appeal is frivolous, and Claimant should therefore be awarded counsel fees. (Claimant's Br. at 9-12, 17.)

[4] As explained in *Whitfield*, another method of establishing a disability is through an impairment rating evaluation (IRE) under former section 306(a.2) of the Act, repealed by the Act of October 24, 2018, P.L. 714 (Act 111), 77 P.S. §511.2, now section 306(a.3) of the Act, added by Act 111, 77 P.S. §511.3, which is distinct from a showing of loss in earning power. *See Whitfield*, 188 A.3d at 612-14. The IRE process is not at issue in the instant case.

10

from employment following his failure to comply with Employer's drug-testing policy. Both this Court and our Supreme Court previously have considered similar arguments, and have developed a relevant principle of law:

> If an employer alleges that the claimant's loss of earnings is the result of a post-injury involuntary discharge, the employer bears the burden of proving that suitable work was available or would have been available but for the circumstances which merit allocation of the consequences of the discharge to the claimant, such as the claimant's lack of good faith.

*Reyes*, 967 A.2d at 1077 (quoting *Second Breath v. Workers' Compensation Appeal Board (Gurski)*, 799 A.2d 892, 900 (Pa. Cmwlth. 2002)); *see also Carson Valley School v. Workers' Compensation Appeal Board (Estate of Ashley Conway)* (Pa. Cmwlth., No. 1159 C.D. 2016, filed Mar. 17, 2017) (unreported), slip op. at 9 ("Because disability requires loss of earnings, a claimant is not entitled to disability benefits where the claimant's loss of earnings is a result of a discharge for bad faith conduct that was committed by the claimant subsequent to the injury or was not known to the employer until after the injury.") (citing *Vista International Hotel*, 742 A.2d at 656-58; *BJ's Wholesale Club v. Workers' Compensation Appeal Board (Pearson)*, 43 A.3d 559, 563 (Pa. Cmwlth. 2012)).[5]

The benefit of this approach, our Supreme Court has explained, is that an employer is precluded from suspending a disabled claimant's benefits merely by terminating the claimant's employment. But by allowing fault-based considerations to inform the analysis, the employer can establish grounds to suspend benefits where an alternative job would have been available, and the claimant's earning power not so

---

[5] An unreported opinion of this Court may be cited for its persuasive value and not as binding precedent pursuant to Commonwealth Court Internal Operating Procedure section 414(a), 210 Pa. Code §69.414(a).

11

impacted, had the claimant not been terminated for bad faith misconduct. Under this approach, "a partially disabled employee who, by act of bad faith, forfeits his employment would not be eligible for total disability benefits, as suitable employment was in fact available but for the employee's own wrongful conduct." *Vista International Hotel*, 742 A.2d at 658. On the other hand, "a partially disabled employee who acts in good faith to undertake work with restrictions would not be deprived of benefits that he plainly would have received had no light[-]duty employment been offered merely because the employer subsequently elects to terminate such employment." *Id.* Our Supreme Court in *Vista International Hotel* held that the default rule remains that "a claimant who has established a partial disability due to a work-related injury should generally continue to receive partial disability benefits by virtue of his loss in earnings capacity, even though subsequently discharged from employment, because the loss in earnings capacity remains extant." *Id.* However, "[w]hether the same claimant may receive total disability benefits depends upon whether the employer can demonstrate that suitable work was available or would have been available but for circumstances which merit allocation of the consequences of the discharge to the claimant, such as claimant's lack of good faith." *Id*.

In *Virgo*, this Court further expounded upon the bad faith standard:

[T]he stricter willful misconduct standard [applicable to unemployment compensation cases] is not the standard of "bad faith" in the context [of] allocating fault in a workers' compensation case. Nonetheless, some "bad faith" willful misconduct on the part of the claimant that caused the discharge has to be established or benefits will not be suspended or will be reinstated. If, for example, a claimant receives unsatisfactory performance evaluations based solely on an inability to perform despite good faith efforts to do so, bad faith on the part of the claimant has not been made out. Simply put, to make out "bad faith" or "fault on the part of a discharged claimant," if an employer only shows that he or

12

she "would if he or she could," then "bad faith" is not shown and benefits should continue or be reinstated; but if an employer establishes that the claimant "could if he or she would, and didn't,'" "bad faith" is established and a claimant is not entitled to continuing benefits.

*Virgo*, 890 A.2d at 19 (citations omitted).

The employer bears the burden to demonstrate that the conduct resulting in the claimant's discharge amounted to bad faith on the part of the claimant. *Vista International Hotel*, 742 A.2d at 657-58. "The WCJ, as fact finder, determines whether a claimant was discharged for conduct evidencing lack of good faith." *Coyne v. Workers' Compensation Appeal Board (Villanova University)*, 942 A.2d 939, 946 (Pa. Cmwlth. 2008) (citing *Second Breath*, 799 A.2d at 900); *see also BJ's Wholesale Club*, 43 A.3d at 564 ("[T]he issue of whether [the claimant's] conduct evidences lack of good faith is a question of fact to be determined by the WCJ . . . .").

To state the above principles of law is to reveal the difficulty facing Employer in its appeal. A central consideration in all of the above-discussed precedents was the initial credibility determination of the WCJ, in his role as fact-finder, as to whether the claimant acted in bad faith with respect to an employer's rule or policy, resulting in the discharge. *See, e.g.*, *Vista International Hotel*, 742 A.2d at 659 ("[B]ecause the WCJ made the specific finding that [c]laimant was terminated as a result of no fault of her own, and [e]mployer made no showing that other suitable employment was available to her, the award of total disability benefits should stand."); *Second Breath*, 799 A.2d at 901 ("[W]e conclude that the Board properly affirmed the WCJ's determination that [e]mployer failed to meet its burden of proving that [c]laimant was discharged for work-related misconduct. We emphasize the WCJ's statement in this regard, *i.e.*, '[t]he reasons for [e]mployer's termination of the [c]laimant are found to be not credible.'"); *Carson Valley School*, slip op. at 10 ("[The

13

employer] did not meet its burden of showing that [c]laimant was discharged for bad faith conduct. The WCJ, who has sole authority over issues of credibility of witnesses, found [c]laimant credible and accepted her testimony in its entirety, and this conclusion may not be revisited on appeal.").

Even in *Edwards*, upon which Employer presently relies, this Court relied upon the WCJ's findings of fact and determinations of credibility to uphold the determination of bad faith misconduct. The claimant in *Edwards*, unlike the instant case, tested positive for illegal drug use, and the claimant stipulated to the authenticity of that result. *Edwards*, 770 A.2d at 808. The WCJ had expressly found that the claimant was aware of the employer's policy regarding illegal drug use and that his employment was terminated because he violated that policy. Importantly, "the WCJ accepted the testimony of [e]mployer's witness and found that a sedentary position within [c]laimant's medical restrictions was available at the time of the termination of his employment." *Id.* In light of the WCJ's findings of fact and assessments of credibility, this Court affirmed the Board's decision, affirming the WCJ's suspension of the claimant's benefits.

Here, by significant contrast, the WCJ expressly credited Claimant's testimony that he did not intentionally refuse to comply with Employer's drug-testing policy, and that he was instead unable to comply because he could not produce a second urine sample while being observed. (F.F. ¶9 ("Claimant is also credible and convincing that he was not purposefully refusing to provide a urine sample as required by the . . . Employer's work policy.").) The WCJ repeatedly reiterated this credibility determination. (F.F. ¶¶13-14 (crediting testimony of Ms. Shegda, Dr. Oteri, and Mr. Johnson, but only to the extent that testimony did not conflict with Claimant's testimony "as to his inability to provide the second urine sample and not his refusal to

14

provide that sample").) These findings fall cleanly within this Court's discussion in *Virgo*—that bad faith in connection with an inability to perform a required duty is established by showing that the claimant "could if he or she would, and didn't," but such bad faith *is not shown* where the claimant "would if he or she could." *Virgo*, 890 A.2d at 19. The WCJ's findings here amply support the proposition that, with respect to providing a second urine sample under observation, Claimant "would if he could," but he could not. The WCJ's findings of fact, therefore, support the conclusion that Claimant did not act in bad faith with respect to the policy, even though his failure to comply therewith resulted in his termination.[6]

"The WCJ, as fact finder, determines whether a claimant was discharged for conduct evidencing lack of good faith." *Coyne*, 942 A.2d at 946. This is a determination that flows from the WCJ's exclusive prerogative to assess the credibility of witnesses—a determination with respect to which an appellate court may not substitute its judgment. *See School District of Philadelphia v. Workers' Compensation Appeal Board (Hilton)*, 117 A.3d 232, 246 (Pa. 2015) ("The WCJ, as the ultimate finder of fact, has exclusive province over questions of credibility and evidentiary weight, and

---

[6] With respect to Chairman Frioni's dissenting position in this case—that suspension of benefits would be proper inasmuch as Claimant was discharged "because he violated policy, not because he was unable to provide a specimen in front of a physician"—we note that this conclusion overlooks the critical determination of whether the violation of a policy was done in bad faith. It is not the mere violation of a policy that is significant to this inquiry, but whether the claimant "by act of bad faith, forfeits his employment." *Vista International Hotel*, 742 A.2d at 658. As noted herein, the WCJ made an unequivocal finding that Claimant did not intentionally refuse to comply with Employer's policy.

Nonetheless, we conclude that Chairman Frioni's dissent provided Employer with a nonfrivolous basis upon which to pursue an appeal, and we thus decline Claimant's request for attorney's fees pursuant to Pa.R.A.P. 2744. *See id.* (stating that an appellate court may award attorney's fees "if it determines that an appeal is frivolous or taken solely for delay or that the conduct of the participant against whom costs are to be imposed is dilatory, obdurate or vexatious").

is free to accept or reject the testimony of any witness in whole or in part. This Court will not disturb a WCJ's findings when they are supported by the record, as is the case here.").

Accordingly, the order of the Board is affirmed.[7]

_____
PATRICIA A. McCULLOUGH, Judge

---

[7] Claimant is able to prevail upon the merits of Employer's appeal, so we do not find it necessary to address the record-intensive question of whether Employer waived any or all of its affirmative defenses. *See supra* note 3. For purposes of the substantive issue presented by Employer, the WCJ was able to develop the record and issue a reasoned decision, and his findings of fact are more than sufficient to address the merits of Employer's challenge. *See Ross v. Workers' Compensation Appeal Board (International Paper)*, 859 A.2d 856, 857 (Pa. Cmwlth. 2004) (declining to find waiver of statute of limitations defense because the WCJ "was presented with the limitation period issue and was able to develop the record and his 'considered reasoning' on that issue"). Therefore, for present purposes, we will assume without deciding that Employer sufficiently preserved the issue for the Board's review, and for purposes of this appeal.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Bear Staffing,                  :
         Petitioner          :
                                 :   No. 949 C.D. 2020
      v.                        :
                                 :
Shawn Logan (Workers'       :
Compensation Appeal Board),   :
          Respondent      :

## ***ORDER***

AND NOW, this 15th day of October, 2021, the September 2, 2020, order of the Workers' Compensation Appeal Board is AFFIRMED.  The request for attorney's fees filed by Shawn Logan, pursuant to Pa.R.A.P. 2744, is DENIED.

_____
PATRICIA A. McCULLOUGH, Judge